As I understand it, Mr. Black, you are seeking to vacate the judgment, and unless you are insufficiency of the evidence claim succeeds, have this case remanded for a new trial? Correct. And your client is aware that he would re-expose himself to the death penalty if that occurred? Correct. And he still wants you to press forward with the appeal? Without giving away those confidences, I would just refer the court to my two ex parte motions for funds for traveling to Orlando to visit him. I don't want you to reveal confidences. I simply would like some level of assurance that your client is aware of the risks that are engendered in that course of action. I flew to Coleman twice. I had long interviews with an interpreter because he does not speak English at all. The interviews lasted over an hour, so I can assure the court that he is well aware, well aware of the consequences and he was very clear of his decision. That's all I can say. Very clear. No doubt. Not one. I didn't even have to say two words. He was very clear in that. That's why I flew down there twice. I thought it was important in this case, and I believe the court did too, which is why they allowed my motion. Fair question, though. I have three issues, and I'm also aware of the court orders about being careful. Many of my issues relate to those proceedings, but I know the court has read everything and probably very well aware of the facts of this case, so I don't have to go into details. I think issue number one related to the closed courtroom issue is a fascinating issue because the facts in this case are really different than most of them. Again, without getting into what went on in the sealed proceedings, the court clearly made an underwhelming decision to, I mean, I put the word fake out the press and the public, and essentially that's what he did. He told everybody to leave. The lawyers to pack up their bags to go, and they all did. He told them to come back at 6.30 p.m., which courtroom were closed or not. I only can assume that because at 4.30 or 5 o'clock, outside courtroom doors are locked. He relented to the defense counsel's objection and said, okay, I won't close the courtroom. But then when the court officer informed him that there were people still in the hallway, he told everybody to pack and leave, until everybody was done for the day. And then everybody came back at 6.30, and there was no indication from there that anybody else was in the courtroom at that point, except for counsel. Were you a trial lawyer? Excuse me? Were you the trial lawyer in this case? No, no, no. There were two trial lawyers, one local and one on the death penalty list. Mr. Runke from New Jersey was one, and then co-counsel from Puerto Rico was another one. He had two lawyers, but not me. No, I was on the appellate panel. I understand that there was no – the trial counsel refused to consent to the district court's suggestion that the courtroom be closed, and didn't agree to this kind of Rube Goldberg procedure that the district court then devised in an effort to keep the courtroom open, but protect the witness. But was there an actual objection to that procedure? It seems to me not consenting is different than objecting. Well, it's interesting, and I would admit to the court the following, that initially there was, I would say, just an expression of reluctance. But after he thought about it, and this was before the procedure went on, so I think it was contemporaneous, he thought about it, and then he said, I can't agree with this procedure. Now, I don't – I mean, did he say, I object, using those words? I am not 100% sure. See, the problem with I can't – that's what I thought the record showed. The problem with I can't agree is the district court had asked for consent. And I think it's reasonable to interpret, in view of that request, I can't agree as meaning I'm not going to consent to it. But to me, there's a difference between not consenting and objecting. Well, in reality, I'm not quite sure how that is a difference with any kind of standing at all. So first the judge said, I'm going to actually close the courtroom, lock it. And he thought about it, and he said, he said, I can't agree with this. And then the judge said, okay, I won't close the courtroom. And that's when the whole conversation with the bailiff, with the marshal, with the bailiff occurred, where the bailiff said, there's still people in the hallway. And that's when the judge said, tell everybody that we're done for the day. Pack up your bags and come back. And he said, I can't agree with this procedure. And the judge did it anyway. Now, technically, I think Judge Sully, you're right. He didn't say he was going to object. All right. I realize your time is limited. Let's assume, for argument's sake, favorably to your position, that I can't agree amounts to I object. Then it seems to me there are two remaining questions. One is, was there actually a courtroom closure? And two is, if there was, was that justified by the need for witness protection and security? Well, answer question number two first. I understand that the government is arguing that there was no closure. And I would maintain that that's fairly disingenuous. When a judge goes through the process of, again, faking out the public and the press by essentially lying to them, we are done for the day. Let's just take the premise of Judge Sully's question. Was there an actual courtroom closure? That there was. And whether it was justified. That's the real question we'd like an answer to. In this particular case, in this particular situation, and the way it went down, I would say it is not justified. First of all, the court was mandated to make very specific findings and curtail their procedures, specifically tailor them to this case. He never did. He just said, I'm doing this. And he never said, okay, I'm doing this for these reasons. And made specific findings. And also, with the cases I cited, he has to give notice, he has to give an opportunity for the press to come in and object. He didn't give any of that to anybody. And there was a Fifth Circuit case that I cited where sort of the same thing. The judge said, well, I'll put on sentencing on this date. And then on that date, he changed it without telling anybody. And then everybody came back in. And nobody was there when they did it. And the Fifth Circuit in that case said, you can't do that. You have to give notice to specifically give reasons. There were no reasons articulated. I mean, I understand the general tenor of this case. I do. I get it. And I understand maybe why he was thinking the way he did. But he did not tell anybody what he was going to do. He did not tell anybody why he was going to do it. And he did not tailor his particular remedy accordingly. He didn't say, well, you know what, there are other ways I can effectuate this purpose. And he never did that. He just said, okay, this is what I'm going to do. And the defense lawyer did say right away, I can't agree with this. Did the defense lawyer propose another solution? No. Nor was he asked. But he did not. And there was no other solution discussed. Again, it went from, I'm going to close, to response to the defense counsel, all right, since you object, I won't close, but I'm going to do this. So just, again, to answer your question, when he said he was going to close it, the defense lawyer did say, I have a problem with this. Now, I understand. Which defense lawyer? You said there were two defense lawyers. Correct. And which defense lawyer is that? Lundke, who was the death penalty qualified lawyer, was the one who was really involved in this particular exchange. And who's, what's the name of the other one? It's not really irrelevant. I was just curious more than anything else. Yeah, I don't have the name off the top of my head, but David, but Attorney Lundke was the one that was primarily involved in all of this process. If there are no questions, can I move on to the Rule 29 motion? The Rule 29 motion is interesting, because it has to be a violent act for the purpose of gaining entrance to an enterprise or maintaining your position in an enterprise. He was in, we know, he was in prison for six years prior to this. And he was running an enterprise from there. For three years, maybe, but not for the last three. There was testimony from Wilfredo, and I'll just refer to his first name, that three years prior he was cut off. He was cut off, nobody talked to him, they were not interested in him, he wasn't getting any money. There was a fight, and they kicked him out. So he was not running the enterprise. And there was no enterprise as far as he was concerned. He was eliminated. There were two witnesses, Wilfredo and Wilfredo's wife, who testified to that. That Wilfredo and Wilfredo's brother were in charge. And at that point in time, for three years, he wasn't running the enterprise. It's true, for the first couple, he was getting a little bit of money back. The last three, they cut him off. So how was he involved in the enterprise? He wasn't. Well, but you're giving a very narrow construction to the verb maintaining his position, alright? Certainly he had a position, alright? So on your theory, he's shoved aside by two other people, and as soon as he regains his freedom and is in a position to do it, he attempts to re-establish his authority. Now that seems to me, certainly within the spirit of what Congress was attempting to criminalize in the Vicar Statute, and I suggest that it's not a stretch to construe the verb maintaining your position to cover a situation here where you're trying to re-establish the position that you had at the point you were cut off while in prison. Well, it's interesting that the argument would be, and the argument from the government would be, that he was trying to re-establish his position. He was trying to wipe out everybody. That's a pretty good way of re-establishing your position, killing the competition. But it was not competition. It was an enterprise that he was part of, and when he got out, this was a revenge killing. He was angry that these guys took over when he was in jail, and he tried to kill everybody. How is this trying to maintain his position? Isn't that for the jury? Isn't that for the jury? Here he comes in and he tries to kill the very people in their cohorts who have pushed him out of the enterprise. You say that that's revenge. The government says that's to re-establish his position. It seems to me the facts are consistent with both interpretations, so why is it not a jury question? If the court ruled that, there are no cases that I could see where that statute was ever, ever, and I may be wrong, but ever applied this broadly. There always had to be, in all the cases I looked at, First Circuit through all of them, that there had to be some kind of nexus. Some kind of nexus to an enterprise. Well, there is a nexus to an enterprise, if you buy the government's re-establishment theory. He didn't kill these people because they had insulted his grandmother, or because they had said bad things about his taste in clothes. He killed these people because they had taken his valuable criminal enterprise out from under his hegemony. Now you say that's revenge, the government says that's because he wanted back in, and I say why is it not a jury question? Because there has to be an enterprise that he was part of. Can I add maybe to this a little bit? You admit that he had an enterprise at one point. I would have to. I think the evidence is really clear. Right. And you admit that he continued to have some influence on that enterprise at some point while he was in jail. It appears from Wilfredo's testimony that he had some kind of connection for at least the first couple of years. Right. And then there was a cutoff. Yeah, but that enterprise continued even when he lost influence apparently. The enterprise continued. But not the defendant's enterprise. Wait a minute, wait a minute. Okay. The enterprise continued, and then when he gets out he wants to get back into it again, or continue his prior connection to it. Of course the court understands that that's pure speculation and assumption. Well, I don't know. A lot of bullets flew to make it look more than just speculation. There were a lot of bullets that flew. There were. But that was three years, three solid, this is not like a month after. Three solid years after he was out, ousted from the enterprise. All right, we're going to move on. We're done.  I'll submit a brief on the rest. Thank you, Your Honor. Thank you. Yes. Good morning, Ms. Beck-Hill. Good morning, Your Honors. May it please the Court. Judge Torrella, the local counsel was Francisco Rebollo. I have three issues I'd like to discuss, and I don't want to spend all of my time on the sufficiency of the proof. No, but it should be apparent to you from the dialogue up to this point that the two things that are of principal interest to us right now are first, this so-called courtroom closure claim, and secondly, whether or not there is evidence here sufficient to show a vicar offense. Excuse me. Am I right that your client is not involved in the issue of the courtroom closure? Your Honor, I filed a motion to join in co-counsel's, he is involved, let me put it that way. Well, you didn't object, nobody objected. Correct. The issue for my client is whether it was waived or forfeited. That's the issue for my client. Okay. Your client consented to the closure, didn't he? His counsel did in his absence and without consulting him. But aren't clients bound by lawyers' stipulations? Your Honor, my position is that when we're talking about a fundamental right, the denial of which is structural error, an attorney's statement made in a closed meeting with the court where his client is not present, knows nothing about it, is not consulted under those circumstances cannot constitute a waiver. But how do we know whether your client was consulted about it or not? We can't take that on the basis of what you tell us. No, Your Honor, but the proceeding where all of this was discussed and decided was closed and in the judge's chambers. Yes, but that tells us nothing about what your client had talked with his lawyer about. That's why we have 2255 proceedings. We have authority in this circuit that a lawyer's consent to the closing of a courtroom binds the client. Now, that can be revisited on 2255. Indeed, it was in the very case that I'm thinking of, although we held that 2255 didn't work. I understand that, Your Honor. I think there's a difference when it's a closed proceeding and the defendant is not present in that closed proceeding and there is no recess in which the counsel could have gone out and consulted. If you read the transcript, I'll stand on the transcript. I understand the court's concern. I would like, if there are no more questions on that issue, to move on to two vicar or vicar issues that I have. Are there additional questions for me on the closed court? All right. Very briefly, the principal issue for Mr. Oquendo is the lack of proof that he had any motive related to any ongoing enterprise. But before I go into depth about that, I would like to respond to the court's questions and perception about Candelario's ongoing relationship to an enterprise in October of 2009. I submit that it's like we have two major supermarkets here in Puerto Rico. One is called Amigo and one is called Pueblo. And in the shopping center, the Amigo can decide it's not doing well and leave and pack up. And the Pueblo enterprise comes in and establishes itself. Now, there's a continuing, there's an enterprise going on with people selling the same things in the same way continually. But there's no continuity of interest by those who are getting the profits and doing the business. And I suggest that's what happened here. But isn't this situation much more analogous? Use your analogy that Amigo isn't doing well and so there's a hostile takeover and management gets thrown out. New management comes in. The supermarket continues running. And now the old management wants back in. It seems to me that's a theory perfectly consistent with the facts that we've got here. I think it's not, Your Honor. The testimony by Wilfredo Nunez-Rulfo was that they did business very differently. They didn't have the same people. Yeah, new management often does business differently than the old. But they didn't have the same suppliers and business was terrible. It was not the same enterprise simply because it was in the same location. It was the same business. They were both selling drugs. Right. That's the same. At least some of the people were the same. Am I not correct? Rulfo was out when Candelario was in charge. He had to go away because Candelario was trying to kill him. And Rulfo then came back and brought his brother Pedro and they both involved their wives. Well, am I right that at least some of the people were the same? Maybe not all of them. They had previously once been involved but were enemies of Candelario's. I think it's stretching the point very, very far to call that continuity. Drugs are sold in the same location like supermarket goods are sold in the same location. The fact that drugs are sold in a location does not make it the very same enterprise. May I ask you a question? If the enterprise itself continued, although Candelario's involvement may not have, does that get you past 1959's reference to gaining entrance to the enterprise? Yes, because from this evidence it was clear that the enterprise that was going on at the time was not something that Candelario wanted to enter. He wanted to destroy it. And the prosecution conceded. He was a general without an army. He wanted to start all over again. He didn't want into that enterprise, that modest little thing that Pedro and Rulfo and their wives had. He wanted to destroy it for revenge. And Judge Celia, there actually is testimony that Candelario was upset at Rulfo for a dalliance with his wife. We don't know what motivated this. Okay, so you have this evidence or this theory, the government's theory, is that he was announcing that he was back and taking over. So I'm going to go back to Judge Celia's original question to Mr. Black. Why isn't that just a jury question? Because it's the prosecution's burden to prove that the enterprise continued essentially in the same form as alleged in the indictment until the date of the incident. But that doesn't address my question to you about gaining entrance. It didn't continue in essentially the same form. I'm sorry. If the question, first of all, the prosecution did not prove that it continued in essentially the same form, Ramirez, Patrick, other cases cited in my brief, Nacimiento, and the theory that Candelario wanted into the enterprise that was continuing at the time of the shooting is inconsistent with the evidence. He didn't want into anything. He wanted to destroy it. There was nothing left. So you think that the jury would be credulous enough to believe that what Candelario wanted was to wipe out the people who were running the drug business and then he was going to walk away from it? He wanted just revenge and he didn't care. He wasn't planning, if he hadn't been apprehended, to then reassert himself and take over the enterprise the next day. Your Honor, I cannot believe that the jury would be credulous enough to think that a man who is recently released from prison, probably under supervision because his term is not over, who is known notorious in the neighborhood, a resident of the neighborhood, is going to commit this massacre and then come back and set up a drug business there. That makes no sense. It is totally implausible. Wasn't Rufo left in charge when Candelario went to jail? No. Omi. His name is Rodon. No, I know about Omni. I was going to ask you about Omni too, but I was under the impression that both Rufo and Omni were left in charge. No, Omni was left in charge and after Candelario was gone, at some point Rufo came back and made a deal with Omni that he could also be there with Omni. All right. They were in the pre-incarceration situation. No, this is 2006. I'm sorry, this is prior to 2006. It may be 2001, 2003, somewhere in there, but it's prior to 2006. Well, I'll have to check the record again, but my impression is that they were involved before he went and they were there after he went, which would lead some credibility to the fact that the enterprise may have changed somewhat, but it was the same enterprise. I submit, Your Honor, that a careful reading of the evidence reveals that it was not the same enterprise. I must concentrate on the lack of proof that David Oquendo Rivas had any enterprise-related motive. Isn't Oquendo's motive on the government's theory in the case dependent on whether the jury could supportably find a motive for Candelario? No, Your Honor. The government's theory is that Oquendo was along for the massacre because he was supporting Candelario and shared Candelario's interest in having Candelario either reestablish himself in the enterprise or gain entrance to the new enterprise, whichever way you look at it. The problem is there is no evidence that he shared that interest or motive. He was not a member of the gang before. He did not participate afterwards. There is no proof that he was rewarded in any way by the enterprise or expected to be. The argument that Candelario started, if it was not the same enterprise and Candelario did not want to rejoin it, there's clearly no conviction. But the lack of proof of Oquendo's relationship to the participants or the enterprise or anything before or after, there's no evidence when, how, by whom he was recruited. And, Your Honors, there is in the evidence the following. Mr. Oquendo lived not far away. He had a wife. He had a baby. He had a job. He had a family. There's nothing from which one can infer beyond a reasonable doubt that he knew the reason for Candelario's attack and wanted to join Candelario in what I submit was a suicidal venture for Candelario and anyone with any perspective at all about what was going on in that community. It would make no sense. So it's the government's burden to prove David Oquendo's motive, that it was related to an ongoing enterprise. And all of the cases that we have, Brandao, there are lots of cases where people weren't members at the moment, that they participated in an attack or shooting or something. But there is evidence that they knew about it, that they participated in its activities afterwards, that they called on it for assistance because of the gang membership. That does not exist here. And, Your Honors, I submit that the Vicar instructions here were so complicated, redundant, and inaccurate. Are you talking about the jury instructions? Jury instructions. Which no contemporaneous objection was made. I am, Your Honor. Yes. I am. Plain error. Plain error. Plain error. With all due respect, I wouldn't spend much time on that. I understand the Court's position. I haven't. But I do think that they require very careful reading. They are extraordinarily redundant. They are replete with theories that are absolutely irrelevant to this case. They urge the jury to speculate. They refuse, they inaccurately refer to underlying offense without specifying what the underlying offense is. If the jury is going to convict on an aiding and abetting theory, which is, I believe, the only theory on which it could have convicted here. So I submit that those two issues require the Court to reverse Mr. Okendo's conviction. Thank you. I would simply say on the motion to suppress that I know that two members of this panel decided Okendo won. However, that case does not involve the statements to Officer Rodriguez that was waived in Okendo won. And as to the statements to Officer Torres, ATF Agent Torres, the Court noted that it was a very muddled motion. It was a different record. And I urge the Court to review it in this case and adopt the Edwards rule that says that once a defendant has invoked his right to silence or counsel, questioning may not be reinitiated except at the defendant's behest. Thank you very much. May it please the Court. Jenny Ellison for the United States. I'd like to start by addressing the defendant's claims about the alleged courtroom closure. What's alleged about the courtroom closure? Why isn't that a courtroom closure? The District Court believed that he had left the courtroom open and he said that several times. Well, I know the District Court said it, but let's start with the basics. It's pretty unseemly for a District Court judge to lead in the planning of what seems to be an overt scheme to evade the constitutional requirement of an open courtroom. And the purpose of the District Judge's machinations was clearly to defeat public access to the courtroom. There seems to be no other reason that the District Court was doing that other than to try and get around the fact that he couldn't get all counsel to agree to a straight-up courtroom closure. So he decided he would try to accomplish the same result by indirection and chose to cast himself in a particularly inappropriate role in devising this scheme or plan as to how to get there. So why shouldn't we treat this as what it was intended by the judge to be, which was a closed courtroom? Well, I think if the court does view this as a closed courtroom, the District Judge did the work to get there. The judge had actually already decided to close the courtroom when there became this issue with counsel and so then employed this different procedure. But the judge had already done the Waller analysis at that point, and the Waller analysis fully supports any closure here. What about the defendant's claim that Waller and its progeny require that the District Court, before closing the courtroom, give some notice to the press and the public? Well, I know that Mr. Candelario has cited this Fifth Circuit case in which the Fifth Circuit concluded that there should have been notice beforehand to the press and the public. I think that in this case, the District Court believed that he was leaving the courtroom open and so wouldn't have thought that it was necessary to give that kind of notice. But if we conclude that this was de facto a closed courtroom, what do we do with the absence of any notice to the press? I think certainly when a court closes a courtroom, it is preferable to give notice. And what do we do with the fact that that wasn't done here? In this case, I think Mr. Candelario and Mr. Acendo wouldn't really have standing to raise that issue. They were both present. Neither one of them was denied access. So they were not deprived of any kind of First Amendment right of access to the proceedings. I obviously don't understand this argument that they don't have standing. It is the defendant who has benefited the most by having a public trial. And having access to the press present and the public present supports that right. So why don't they have standing? I don't understand it. Explain this to me. They certainly can bring their Sixth Amendment public trial right to vindicate exactly what Your Honor describes. I think that it is certainly a core value. It's important to defendants. And that's why the Supreme Court has made it clear that it should be unusual and there needs to be a high standard satisfied when there is a closure. But that standard was met here. And the district court created a record that allows this court to review its decision. Before you get away from the question though, are you saying that the notice to the press is in aid of a First Amendment right? Is that why you're saying the defendant can't raise it? Yes, Your Honor. But doesn't that undercut, as Judge Tortoway's question implied, the defendant's right to a public trial? The fact that if the courtroom is going to be closed, the public and the press ought to be notified of that. So they, along with the defendant, would have a right to challenge that? Yes, but I think that the way that the Supreme Court has looked at this is really looking at when a criminal defendant wants to raise this claim, it's a Sixth Amendment claim. And that's the issue that's before the court here and not the First Amendment claim that theoretically could have been raised. So what are you saying? So we've got a defendant. He's making a Sixth Amendment claim. He says that the courtroom closure, if this is one, is invalid as to me because of the failure to give notice to the press and public. And your response is? I don't think that that is a basis on which a defendant can object. Why? Because of your lack of standing argument? Because under Waller, what the court has to do is satisfy the four factors set forth in Waller. And one of those factors is not this procedural requirement of notice to the press and opportunity to be heard. And so for a Sixth Amendment claim, this court looks at the Waller factors. And I would also just like to say that because the Waller factors were satisfied here, if there had been a First Amendment challenge by the press, that challenge would have failed on the merits because the Waller standard is satisfied. And I'd like to pull back and talk a little bit about the situation that the district court was facing when it entered into the sealed conference. And again, I will try not to get into too much detail about the sealed conference itself. I think we all understand that there was a security reason for closing the courtroom. I don't think that's really being contested. What's being contested is whether the district court went about it in an appropriate way and in a way that adequately protected the defendant's right to a public trial. Yes, and with respect to the defendant's Sixth Amendment right, what matters is the four factors in Waller and the district court satisfied those four factors here. And we've submitted arguments about this. And I know the court is very familiar with what happened in that conference. But even before the conference, some of the facts that were available to the district court were the fact that within the few days preceding that seal, the in-conference chambers, the in-chambers conference, there were four different witnesses who testified that they had recognized one of the defendants at the shooting and had recognized him on the scene and that all four of those witnesses said that they had not come forward because they were afraid. Citations for that are at Akendo's appendix pages 454, 599, 735, and 995. In addition, one of the other witnesses testified that when she witnessed Mr. Candelario commit a prior murder, killing her brother, that Mr. Candelario later would call her on the phone and make threatening phone calls about how he was going to burn down her house with all of her children inside if she told anyone what she had seen. Given all of this context, going into this in-chambers conference, I think the court recognizes that there was a serious security risk. The district court, again, without getting into detail, did go through a number of different options, was clearly very cognizant of the need to keep the courtroom open to the extent it was possible to do so, was cognizant of the defendant's rights to a public trial, and really was very careful about the process that he went through to reach the point he did. I understand the court's concern about the approach that the judge took here in not doing a formal closure and instead adopting this different procedure, but it doesn't change the fact that his Waller analysis was correct and that the defendants do not have a viable Sixth Amendment claim because the Waller standard was satisfied. I'm happy to answer more questions on this issue. I know this is an important issue. I would also just briefly like to address the question about whether there was an actual objection from Candelario's counsel. I think that, as Judge Salia pointed out, the counsel said he did not consent. He did not explicitly say he objected. And moreover, when you, and again, I don't want to get into too much detail, but if the court reviews what happened in that in-chambers conference, at no point does Mr. Candelario's counsel suggest that any of the Waller factors are not satisfied, nor is there any objection raised to the lack of public notice, to the fact that this procedure was not going to be, the public was not going to have a chance to weigh in. That's not something that anyone raised. And given how central this discussion was, this was the focus of the conference, I think the issue was on the table. If someone had wanted to object to that aspect, they had an obligation to do so. And nobody did. Did the government have any obligation? I think that the government certainly, we are under regulation to do what we can to maintain the public trial. Can you just briefly tell me how the government met this obligation? I think in this case, you know, it was a difficult situation. It was an evolving situation that everybody was dealing with on the spur of the moment, and I think the government. Just tell me, did the government say, Judge, these are the requirements of the Waller case, and I believe you met X, Y, Z, but you haven't met Z, or you haven't met all of them, or did they do anything like that? No, Your Honor, the government didn't. But I think that's because the court was actually ahead of everyone on this. The court was creating the record along the way, was asking the right questions, was discussing the right issues, and so there was no need for the government or defense counsel to get the judge to focus on something that the judge was overlooking because the judge was paying attention to what he needed to pay attention to. So you don't think the government had to say anything because everything was obvious, but you don't think that saying I don't agree with this is equivalent to I object. Well, Your Honor, the government did not challenge, did not raise forfeiture in its brief on this issue, but I think what is important to look at, though, is the fact that defense counsel, who was present and was witnessing everything the judge was witnessing, didn't actually have a specific objection to the application of any Waller factor. There was no suggestion that there was not an overriding interest. There was no argument about there being an alternative to what the judge was proposing, no alternative suggested by defense counsel. So I think that from that perspective, it really is more confirming the fact that the judge did not leave any loose ends on the table, the fact that defense counsel didn't raise any of these concerns. So I'm happy to answer any more questions the court may have about this issue, but otherwise I will turn to sufficiency. So first I'd like to just address the argument that the enterprise was no longer an ongoing enterprise at the time of the crimes. I think we addressed this in our brief, and I think the court understands the arguments, but just to recap them quickly, this is an organization that had been selling the same drugs in the same location for at least 16 years going up to the night of the murder. And there was a question earlier about whether exactly what Rufo's role in the organization had been. What happened is that beginning in 1993, Rufo and Candelaria were both working in the organization originally as sellers, kind of working their way up through the chain of command. Candelaria at a very young age became the owner of the drug point, but Rufo was still working underneath him. And then when Candelaria had to flee the country because he had committed so many murders in Puerto Rico that he was worried he would be prosecuted, when he left for Detroit, the people he left in charge of the drug point were Omi and Rufo. And it's true that there was a falling out at some point between Candelaria and Rufo because Candelaria was still in control, even though he was no longer in Puerto Rico. He was still controlling the organization from Detroit, and because he became upset with Rufo not paying him the money he thought he was owed, he kicked Rufo out of the organization. And Rufo eventually, kind of when Candelaria was in prison, was able to negotiate with Omi to get back into the structure. But Rufo had been kind of an in-and-out figure constantly in this enterprise. He and Candelaria, I think, and Omi were probably the three most readily identifiable people with this enterprise, at least based on the record that we have. Furthermore, the enterprise, it was not defunct at the time of the murders. And in fact, on cross-examination, one of the defense attorneys asked Rufo's wife about whether Rufo had sort of become the boss or the owner of the drug point, or the drug points in the area. And she said, oh, no, there's only one drug point. And the defense attorney said, well, yes, a very, very big drug point. And she acknowledged that that was so. That's in the appendix, page 465. So this was not a couple of guys on a street corner distributing drugs. This continued to be the dominant, the only drug distribution organization in that neighborhood. And even on the night of the massacre, when Rufo shows up at La Tombola, the first thing he does is he finds a couple of other guys from the organization, Kayon and Hochi, and he makes sure that they're armed. And they all confirm with each other that they're armed. And Rufo testifies. This is at pages 555 to 57 of the Kendo's appendix. He testifies, this is what we would do when we would go out and do activities, is we would make sure that we were ready. And this shows that they were still a team. They were still an organization. And that is why Candelario attacked the way he did, is because everyone was going to be in the same place. He knew this was a way to get all of the people he thought were being disloyal to him at the same time. So just to quickly turn to the suggestion that Candelario's motive was personal, I think there's very little support in the record for the suggestion that this was a personal attack or an attack motivated by anything other than Candelario's resentment over the fact that he had been displaced within the organization by Rufo. He specifically made threats to Rufo only after Rufo and Omi stopped paying him the money he believed he was owed from the drug point. And he carried out those threats. And I think the jury's conclusions there are really the only reasonable inference to draw from the record. But what about Oquendo? Yes. So with respect to Mr. Oquendo, the fact that Mr. Oquendo was there on site at La Tombola, he was working side by side with Candelario committing these crimes, shows that he was fully briefed up about the operation that evening. And I think this is a place where it's important to go back and look at. Unfortunately, we have an extensive history from Mr. Candelario about how he would go about launching his attacks on his perceived enemies in the drug business. And both Rufo and Menor testified over and over again in describing Candelario's prior murders and his prior vendettas against people that he would not only say, we need to kill this person, but he would say why. And he would complain about how the person had wronged him and how the person had stolen money from him or was attempting to compete with him at the drug point. And he explained every time, you know, why he believed this was a… But let's talk about Oquendo, all right? Yes. Because that's a different case. It's clear that Oquendo, there's evidence from which the jury could conclude that Oquendo cooperated with Candelario in the massacre. What evidence is there that he shared Candelario's motive or even knew Candelario's motive? Well, and that's the point I was trying to lead up to, Your Honor, is the idea is that Candelario's practice when he would gather his henchmen together to plan a murder is that he would tell them, this is why we're going to do it. And this happened over and over and over again. I can give the court specific… No, no, but is there any evidence that it happened on this occasion? Because that was the way Candelario operated. And the jury could infer from the fact that Candelario, as this night of violence shows, Candelario had not changed while he was in prison. This was the way he went about his business, was telling his underlings, we're going to commit these murders and here's why we're going to do it. And that there's no indication that he ever held back with his underlings or kept it close to the vest about why he believed that certain murders were necessary for his personal interests or for the interests of the enterprise. And so I think the jury can conclude from that that the same thing happened here and that Akendo and the other people there at La Tombola that night, that Candelario had made the same types of statements to them about Rufo and the other people who they were supposed to kill that night, about how they had also done him wrong in the drug business and that this was going to be his plan to come back. Were the charges against Akendo the same as against Candelario? There were a few extra charges with respect to Candelario. I have to look further into the record. Maybe you can help me. Is there any evidence that Candelario, that Akendo, I mean, had been part of this enterprise before? No, Your Honor. So is this a one-shot deal? I mean, literally? Well, based on the record we have, this seems to have been an initial foray for Akendo. And is that enough to make him part of the enterprise? Well, so there are two different theories on which the jury could have convicted. One is that he was aiding and abetting Candelario. He was specifically charged as an aider and abetter, wasn't he? Yes, he was charged as an aider and abetter. And that provision was charged. And he knew that Candelario was trying to regain his position and that he was attempting to help Candelario do that. But in the alternative, I think you could also, the jury could have reasonably concluded that Akendo had his own enterprise-related motive, which is that Candelario was clearly making a big move that night. He was making a big power move to regain control of this drug enterprise, which was the dominant, the only drug enterprise in the neighborhood. And the fact that Akendo was there supporting him was going to be a way for Akendo to get in on the ground floor when Candelario got his power back. And again, we know from the earlier testimony of Rufo and Menor that the way Candelario operated is that his inner circle consisted of people who were willing to do acts of extreme violence on his behalf, on his say-so. And Akendo was demonstrating that tonight to Candelario. Candelario was there. He would see how willing Akendo was to shoot anybody who came across his path. One of the very first people Akendo shot was a pregnant woman shooting her directly in the abdomen. This is the actions of somebody who is demonstrating, making a public demonstration for anyone present about how violent he is willing to be. And this is the type of demonstration that would impress someone like Candelario, who was known in the community to be so violent, had a history of killing people with so little provocation. This was a way for Akendo to earn his stripes and get into whatever higher position Candelario would be able to secure for himself within the organization, that Akendo would be there riding along beside him. There's a piece of your recitation that I may have missed or that I am still missing. And that is a response to the arguments that we've heard this morning that if one wanted to either maintain, enhance their position, or to regain entry, you wouldn't do it by wiping out the organization. So what's the strongest evidence that Candelario in particular, but it would also apply to Akendo, intended to continue the enterprise after this event? Well, I think Candelario's motives, he had committed many murders even before this point where his goal was to maintain his own personal power, maintain his dominance, and also maintain the dominance of this drug enterprise. He had a great deal invested in this enterprise. And he, you know, even when he was in prison, demonstrated a strong interest in remaining in control. And when it looked like he was beginning to lose control, that is when he began making his threats of murder. But is there any evidence that he intended to continue to work with the downsellers or people who were left alive? I thought that was the argument that we were hearing this morning, is that you don't, you're not attempting to maintain your position when you wipe out the organization. I think that he was, he was intending for, I think he was intending to wipe out anyone he viewed as an enemy within the organization and bring in some of his new people, probably the people who were with him that night. So what's the evidence that would support that theory? The fact that he, well, so he brought with him a team of people. I mean, if he had only, if this had only been about personal revenge and about a desire to wipe everybody out, he would not have needed, frankly, to bring so many people or to do it in such a public way. This was a way to publicly demonstrate to the community, I am in control, I am back, you should be afraid of me. It is such a public thing that people would be afraid not to deal with Candelario if he were to come in and say, I am now running the drug business in this neighborhood. So then, but the point on the other side, I'm not trying to make the argument, I'm just trying to remember how this flows, is he's a well-known figure in that area. How's he then going to, after this event, reestablish a drug operation or continue a drug operation there? In fact, wasn't the evidence that he tried to escape the island on a boat or something like that? Well, that was after he was suspected, I think, of his role in this massacre that he attempted to escape. Correct. Yeah. But that's consistent with the theory of who in their right mind would then try to reestablish themselves as a drug kingpin in that area. It may not have been a very good plan, but I think that the jury could reasonably conclude that that was his plan. Did the Enterprise continue to sell in the mainland while he was in prison or after? Well, his brother, I think for at least a period of time, was remaining in Detroit and there was evidence that the organization, that they were sending drugs up to the mainland for distribution in Detroit. I'm not entirely sure of the timeframe on that and whether that was still continuing as of the night of the massacre, but it was not only a local operation. That's correct. I'm happy to answer any questions the Court may have about the other issues as well, including the jury instructions or the suppression issue. We'll take it under advisement. Thank you all. Thank you very much.